IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALBERTO T. CHAVEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 00663 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Alberto T. Chavez seeks reversal or remand of a determination by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), (doc. # 17). The Commissioner has responded in opposition, seeking affirmance of the decision denying benefits (doc. # 26). For the following reasons, we grant Mr. Chavez's motion for remand and deny the Commissioner's motion.

I.

We begin with the procedural history of this case. Mr. Chavez filed for DIB and SSI on March 19, 2008, alleging that he became disabled on October 22, 2007 (R. 10). His date last insured was December 31, 2012 (*Id.*). Mr. Chavez's claim was denied initially and upon reconsideration (*Id.*). He then requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 8, 2011 (*Id.*); a supplemental hearing was held on July 20, 2011

---

[1] On June 17, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. #14, 15).

(*Id.*). On August 17, 2011, the ALJ concluded that Mr. Chavez was not disabled and denied him benefits (R. 10-18). The Appeals Council denied Mr. Chavez's request for review of the ALJ's decision on December 3, 2012, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

We continue with a summary of the administrative record. In Part A, we review Mr. Chavez's general and medical history; in Part B, the first hearing testimony; in Part C, the second hearing testimony; and in Part D, the ALJ's decision.

### A.

Mr. Chavez was born on June 29, 1973 (R. 194). When he was 15 or 16 years old, he was in a car accident and suffered a skull fracture (R. 62-63, 310). After the accident, Mr. Chavez was in a coma for a period of time and also had surgery, during which a metal plate was put in his head (R. 65, 310). Soon afterward, he began suffering from seizures (R. 310). Also due to the accident, Mr. Chavez experienced difficulties in school and eventually stopped attending in the middle of the 9th grade (R. 64). He has never had a driver's license and instead uses his bicycle for transportation (R. 57-58). Mr. Chavez was married from 1993 to 2000; the marriage ended in divorce (R. 157). He has three children he sees up to three times a week (R. 63).

Mr. Chavez received SSI for a period of time after his accident but testified that his benefits were terminated when he got married in 1993 (R. 63). Between 1999 and June 2001, he worked as a Parts Manager at Autozone (R. 198). In October 2001, he began working at a gas station, where he was employed until October 2007 (R 198).

2

The record does not contain any evidence that Mr. Chavez received medical attention or took medication for his seizures until 2004. On December 6, 2004, Mr. Chavez experienced a major seizure and had an emergency CT scan at Provena Mercy Center (R. 355). He was seen by Dr. Brent Fonner, who opined that the scan showed "encephalomalacia or gliosis," an abnormal softening of the brain tissue, which was likely related to prior surgery due to trauma. (*Id.*) Further, Dr. Fonner noted "possible minimal superficial soft tissue swelling in the frontal region," and that "correlation with prior surgical history and any prior CT scans would be helpful" (*Id.*).

The record is again silent on Mr. Chavez's medical condition and treatment between 2005 and 2007. Mr. Chavez may have visited the hospital again sometime in 2007, but the record is unclear on the exact course of events. He testified and wrote on his application for SSI that he became disabled on October 22, 2007, (R. 57, 153), but it is not apparent from the record whether that date refers to a seizure, to the day he stopped working at the gas station, or possibly to both. Mr. Chavez testified that he stopped work at the gas station in October 2007 because of his seizures; he said he was having too many of them at work and that they were affecting him at work (R. 56, 57). In response to a question from the ALJ about whether "they let you go or did you quit or how did it end" (R. 57), Mr. Chavez replied that "[t]hey let me go" (*Id.*).

Although it appears that the ALJ concluded that Mr. Chavez's brother took him to Mercy Hospital after a seizure and fall in 2007 (R. 62), a closer reading of the transcript suggests that the ALJ confused the date of the original 2004 fall and CT scan (R. 62).[2] Both Mr. Chavez's

---

[2] There is no medical evidence in the record showing that Mr. Chavez had a second visit to Mercy Hospital or a second CT scan in 2007. A close review of the record suggests that Mr. Chavez was actually testifying again about his seizure and visit to Provena Mercy Center in 2004 and that the ALJ, not Mr. Chavez, mentioned the date as 2007. Specifically, when the ALJ asked, "[w]as that back in 2007?", Mr. Chavez replied, "[y]es, oh, maybe it was. I'm not sure. I know it was a while back." (R. 62). Two sentences later the ALJ mentioned an "emergency record" and said that he believed it was in 2007 (*Id.*). No such record from an emergency room exists.

3

sister and brother-in-law noted witnessing a December 2007 seizure in a "Seizure Description Form" they completed in April 2008; his sister called an ambulance but there is no record of it or of a hospital visit (R. 218, 219). In March 2008, Mr. Chavez went to the emergency room at Stroger Hospital after a seizure (R. 335). The physician noted that Mr. Chavez had a history of seizures (*Id.*). Mr. Chavez was prescribed Dilantin, a seizure medication, and was referred to the neurology department (R. 334-35).

In May 2008, at the request of the Bureau of Disability Determination Services, Dr. C.J. Wonais reviewed Mr. Chavez's available medical reports and examined him (R. 310). Mr. Chavez complained of having three types of seizures: (1) he feels mellow and his mind "gets a different feeling" which lasts for a minute or two followed by intense drowsiness after which he sleeps for four to five hours; (2) his "mind feels like it is in another place," he needs to sit down and stop activity for a minute or two followed by intense drowsiness after which he sleeps for four to five hours; and (3) he loses consciousness and there is no movement in his legs or arms lasting for one to two minutes followed by intense drowsiness after which he sleeps for four to five hours (*Id.*). He complained of experiencing about seven seizures per month (the record does not specify which type), and that he has suffered several contusions and lacerations and has soiled himself as a result of his seizures (*Id.*). Dr. Wonais opined that Mr. Chavez was alert and "well-oriented" during the examination and that he had good long and short term memory (R. 311). All other aspects of the physical exam, including gait, neurological orientation, speech, and vital signs were normal (*Id.*).

Also in May 2008, Dr. Ernst Bone filled out a Physical RFC Assessment on Mr. Chavez (R. 313-320). Dr. Bone opined that Mr. Chavez could stand, walk and sit for about six hours in an eight-hour day based on his statement that he has occasional seizures (R. 314). He further

4

noted that due to his history of seizures, Mr. Chavez could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds and should avoid even moderate exposure to hazards such as machinery or heights (R. 315-317). Dr. Bone concluded that Mr. Chavez's alleged degree of limitation was excessive when compared to objective medical evidence but he did not identify what other medical evidence he considered (R. 320).

On July 10, 2009, Mr. Chavez went to Cook County Hospital and saw Dr. Serge J.C. Pierre-Louis, a neurologist, at the Ambulatory and Community Health Network ("ACHN") clinic (R. 352). Dr. Pierre-Louis noted that Mr. Chavez had "probable partial seizures" but did not seek treatment earlier because he did not want to see a doctor (*Id.*). He eventually did see a doctor (the March 2008 ER visit) and was prescribed Dilantin but only took it for a few months (*Id.*). Mr. Chavez reported the same frequency of seizures when taking medication as he experienced without the medication (*Id.*).

On August 25, 2009, Mr. Chavez had an EEG, which Dr. Pierre-Louis found to show abnormal slowing of brain activity which was consistent with localized brain disfunction and "partial-onset seizures" (R. 379). Dr. Pierre-Louis also noted that there were "sharp transients" in the right frontal area, "raising the possibility of an additional irritative focus" (*Id.*). Mr. Chavez saw Dr. Pierre-Louis again on October 30, 2009. At that appointment, Dr. Pierre-Louis noted that Mr. Chavez had an EEG in August 2009 which revealed focal slowing "consistent with partial-onset seizures" (R. 341). Dr. Pierre-Louis also indicated that Mr. Chavez had stopped taking Dilantin, a seizure medication, after his July 2009 appointment because he thought the doctor asked him to do so (*Id.*). Dr. Pierre-Louis prescribed Tegretol, a different seizure medication, to replace Dilantin (*Id.*).

5

On November 23, 2009, Dr. Pierre-Louis completed a "Seizures: RFC Questionnaire" for the Social Security Administration ("SSA") on behalf of Mr. Chavez (R. 337-40). In the questionnaire, Dr. Pierre-Louis diagnosed Mr. Chavez with post-traumatic epilepsy and partial, localized seizures where he can lose consciousness (R. 337). Dr. Pierre-Louis noted that Mr. Chavez had about four seizures per month and his last three seizures occurred in October 2009 (*Id.*). The questionnaire also noted that Mr. Chavez had a history of injury and fecal or urinary incontinence during seizures (R. 338). Dr. Pierre-Louis opined that Mr. Chavez cannot prepare for a seizure and does not have a warning of an impending seizure (R. 337). Mr. Chavez's post-seizure manifestation is exhaustion, which lasts about two hours, and tiredness and weakness, which interfere with his daily life (R. 338).

Dr. Pierre-Louis noted that Mr. Chavez was "off" the medication Dilantin due to a poor response but was compliant with taking Tegretol, despite the side effect of lethargy (R. 338). He could not comment on the effectiveness of Tegretol because it was "too early to tell" (*Id.*). Finally, Dr. Pierre-Louis opined that Mr. Chavez's seizures would likely disrupt the work of co-workers, he would need more supervision at work, he would need to take many unscheduled breaks during work and that he has associated mental problems of depression and memory problems (*Id.*). Dr. Pierre-Louis assessed that Mr. Chavez was incapable of "low stress" jobs because he has problems with attention and concentration (R. 340).

On February 26, 2010, Mr. Chavez followed up with Dr. Pierre-Louis regarding his seizures (R. 368). Dr. Pierre-Louis noted that Mr. Chavez still had uncontrolled minor seizures but had not experienced any major seizures since beginning Tegretol, and that Mr. Chavez was

6

satisfied" (*Id.*). On January 21, 2011, Mr. Chavez visited the ACHN clinic again.[3] Mr. Chavez complained that his last seizure was on September 29, 2010, but that he had multiple episodes per day of feeling "strange" and "almost passing out," but "never quite getting there" (R. 367). The doctor noted that Mr. Chavez ran out of Tegretol in September 2010 and then used his last refill, dated October 2010, to "intersperse" his medication in November and December (*Id.*). The doctor gave the Plaintiff another prescription and ordered him to restart the Tegretol (*Id.*).

In May 2011, Dr. Julian Freeman, a state agency medical expert, reviewed Mr. Chavez's entire medical file, except for the August 2009 EEG (R. 369).[4] Based on this review, Dr. Freeman provided the SSA with a Medical Source Statement of Ability To Do Work-Related Activities for Mr. Chavez (R. 369-77). Dr. Freeman noted that Mr. Chavez could lift and carry with no limitations, could climb stairs and ramps but could never climb ladders or scaffolds, could never be exposed to unprotected heights or moving mechanical parts, and could never operate a moving vehicle due to his post-traumatic seizure disorder (R. 370-72). In regard to sitting, standing, and walking, Dr. Freeman noted that Mr. Chavez had no limitations in an eight-hour day (R. 374). Mr. Chavez's high frequency seizures did not meet any of the listings, he was noncompliant with his medication, and Dr. Freeman noted (incorrectly) that there was no EEG on file (R. 376). Dr. Freeman opined that because of his seizure disorder, Mr. Chavez could not do any activity requiring constant uninterrupted attention (R. 373). In his report he specifically noted that even with full treatment compliance, Mr. Chavez would still be unable to engage in activities where "constant attention to task is required" (R. 373, 377).

---

[3] According to the doctor's notes from the January 2011 appointment, Mr. Chavez had been scheduled to come to the ACHN clinic in September, but had a seizure on the day of the appointment and thus missed it. He was not able to reschedule a visit until January 2011.

[4] As we discuss later in the opinion, Dr. Freeman was not provided with a copy of the EEG to review; the record does not disclose any reason for this omission.

7

**B.**

On February 8, 2011, a hearing was held before the ALJ at which Mr. Chavez, represented by counsel, and his sister testified (R. 52-77). Mr. Chavez testified that he had not worked at all since October 2007 because he was having too many seizures, which affect his ability to work (R. 56-57). During his last three years working as an attendant at the gas station (2004-2007), Mr. Chavez often gave out too little or too much change to customers, which he believes was due to his seizures (R. 66). Mr. Chavez explained that working at the gas station was hard because he was not able to sit down or sleep, and he does not believe he would be able to work as a gas station attendant again because of those difficulties (*Id.*).

While the number of seizures that Mr. Chavez experiences varies, he testified that he had at least two minor seizures a day and cannot control how often or when he experiences them (R. 60-61).[5] Mr. Chavez testified to experiencing staring episodes where he blanks out a couple times a day without warning (R. 65). If the staring episode is a seizure, he feels very drowsy but feels better after sleep (*Id.*). While he did not know how long his minor seizures last, after a minor seizure he either feels "stuck" or feels that he is about to experience a real seizure (R. 66). Mr. Chavez said he experiences the latter type of seizure at least twice a week, and feels drowsy afterwards (*Id.*). Mr. Chavez testified to injuring himself while having seizures to the point where he sought medical help (R. 62). Mr. Chavez also testified he went to Cook County Hospital to see his doctor four times in the last six months prior to the hearing (*Id.*).

---

[5] During Mr. Chavez's testimony, he differentiated his seizures as "major" and "minor," explaining that the minor seizures are "not the same every time. It's always different" (R. 60). Generally, he described minor seizures as feeling stuck or having a "staring episode," and that sometimes he felt like he was about to have a major seizure (R. 65, 66). Although Mr. Chavez never defines what he means by "major" or "real" seizure, based on his 2008 examination by Dr. Wonais, we infer that he is referring to a seizure during which he actually loses consciousness.

Mr. Chavez's last major seizure prior to the February 2011 hearing occurred at his home in his bathtub, about a month prior to the hearing (R. 58). Mr. Chavez testified that he went to Cook County Hospital for his regular appointment soon after the seizure, on January 21, 2011, and was told by his doctor to keep taking the Tegretol to prevent the seizures from happening often, but that there was "no fix for [the seizures]" (R. 59). At the time of the hearing, Mr. Chavez had taken Tegretol for "a year or more" and testified that it helps him a lot, in that he experiences fewer major seizures, but he still gets minor seizures (R. 60). Mr. Chavez mentioned that the side effects of Tegretol include sleepiness, drowsiness and some twitching in his fingers (R. 64).

Diana Marquez, the claimant's sister, testified that since the accident Mr. Chavez gets angry easily, forgets things, and that it is difficult for him to control his emotions (R. 73). Ms. Marquez also testified that Mr. Chavez has staring spells frequently, where it seems like "he's not there" (R. 74). Mr. Chavez's typical day includes watching television and forgetting what is going on (*Id.*). One or two years ago, Ms. Marquez witnessed one of Mr. Chavez's seizures, during which he fell down and was unconscious for two or three minutes (R. 73-74). She called an ambulance but Mr. Chavez refused to go because he did not have insurance and did not want to pay (R. 74). Mr. Chavez often refused to see a doctor because he does not want to pay (R. 75). At the conclusion of the hearing, the ALJ requested additional records from Mr. Chavez's treating sources because some were missing from the file, and determined that he would "try and figure it out there" (R. 76).

On June 29, 2011, the VE provided the SSA with a Vocational Interrogatory in order to give his opinion on the claimant's vocational status (R. 271-75). Based on his review of the record, the VE opined that Mr. Chavez could perform his past job as an auto self-service

9

attendant (R. 273). The VE explained the position involved a variety of duties with frequently changing tasks using different degrees of attentiveness and it did not require "constant, uninterrupted attention" (*Id.*). The VE noted that the issue of "constant attention" is not defined in the DOT but that "most" jobs would accommodate some degree of being "off task" without an effect on overall worker effectiveness or putting workers at risk (R. 274). Jobs that use "different degrees of attentiveness," could allow for up to 15 percent off task work but work situations operating machinery could require constant, uninterrupted attention (R. 275). The VE concluded that the claimant could perform the unskilled occupations of: sales attendant, day worker (house cleaner), or recreation aid (R. 274). On July 7, 2011, after the VE submitted a vocational interrogatory, the claimant's attorney requested a supplemental hearing with the presence of the VE for purposes of cross-examination (R. 279).

### C.

On July 20, 2011, a supplemental hearing was held before the ALJ at which Mr. Chavez, represented by counsel, and the VE testified (R. 24-51). Mr. Chavez testified that when he worked at the gas station, he would tell the manager that he needed help when the store was busy because he occasionally gave customers the wrong change and got in trouble for that mistake (*Id.*). Mr. Chavez also testified that due to the nature of the work, he would have to constantly pay attention to what was happening at the gas station (R. 31).

Mr. Chavez testified that he could not work as a sales attendant (with duties such as providing customer service in a self-service store, aiding customers in locating merchandise, answering questions from and providing information to customers, and stocking shelves) because of his seizures and the high chance of falling down (R. 31-32). Mr. Chavez also testified that if he had to be frequently talking, listening, dealing with people, and serving and handling things,

10

he would have problems because he gets confused easily (R. 32-33). Mr. Chavez said he could not work as a day worker (which would involve performing domestic duties like cleaning, dusting, vacuuming, washing windows, and polishing floors) because he could get injured on various home appliances due to his seizures (R. 33). Further, Mr. Chavez said he could not work as a recreation aide (doing tasks such as arranging chairs and tables, welcoming visitors, answering telephone calls, and monitoring activities of children) because after his seizures he feels drowsy and becomes non-functional (R. 34). His staring spells could affect the way he took care of the children or the way he greeted people because he gets "stuck" in the stares (R. 35).

The VE testified next. The claimant's attorney asked if a hypothetical claimant of the same age, education and work experience as Mr. Chavez, who had a partial complex seizure disorder due to post traumatic epilepsy, who would have seizures that would disrupt the work of co-workers approximately once a month for one to three minutes, who would need additional supervision at work for about half the day, who would not be able to work with power machines or operate a motor vehicle, who would need to take unscheduled breaks, who would not be capable of low stress jobs, and who would miss more than four days of work per month could perform the claimant's past relevant work and could perform any work in the national economy (R. 39-41). The VE responded that the hypothetical claimant would not be capable of past relevant work and would not be capable of maintaining employment in the national economy (R. 40). When the claimant's attorney eliminated the need to take unscheduled breaks and missing work from the hypothetical, the VE responded that the hypothetical individual would not be able to maintain employment if the individual disrupted his coworkers every month, and that individual would not be able to maintain employment with the increased need for supervision (R. 42).

11

The claimant's attorney addressed Dr. Freeman's limitation that Mr. Chavez was not to do any activity requiring constant uninterrupted attention, and asked whether the VE could think of any job meeting that requirement (R. 46). The VE responded that any position would require constant uninterrupted attention for a period of time (*Id.*).

At the conclusion of the supplemental hearing, the ALJ noted that an EEG was referenced in the file but he had not seen it (R. 49). The EEG was supplied to the ALJ on August 10, 2011 (R. 378).

**D.**

On August 17, 2011, the ALJ issued a written opinion finding Mr. Chavez not disabled (R. 10-18). In evaluating Mr. Chavez's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found Mr. Chavez had not engaged in substantial gainful employment since October 22, 2007 (R. 12). At Step 2, he found that Mr. Chavez had a severe impairment of "seizure disorder" (*Id.*).

At Step 3, the ALJ ruled that there were no clinical signs or findings that Mr. Chavez had an impairment that met or medically equaled the severity of any listed impairment, including Listings 11.02 (epilepsy – convulsive), 11.03 (epilepsy – nonconvulsive), 11.08 (spinal cord or nerve root lesions), and 11.18 (cerebral trauma) (*Id.*). The ALJ noted that the abnormal EEG report findings from August 25, 2009 did not change his decision because "the record as a whole,

including the opinion of Dr. Freeman, show[ed] a lack of medical compliance that could [have] result[ed] in increased seizure activity" (R. 13). The ALJ then determined that Mr. Chavez had an RFC to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders or scaffolds due to seizure disorder; and [never] continuously perform all other postural activities (i.e., climb stairs and ramps, balance, stoop, kneel, crouch, and crawl). The claimant can never work at unprotected heights, work around moving mechanical parts, or operate a motor vehicle; no other environmental limitations.

(*Id.*).

In determining Mr. Chavez's RFC, the ALJ provided a cursory review of the medical record, reviewing: Dr. Bronner's review of the 2004 CT scan; the March 2008 emergency hospital visit; Dr. Pierre-Louis' July 2009 medical report, November 2009 RFC questionnaire, and a February 2010 medical report; a January 2011 ACHN clinic visit report; and Dr. Freeman's 2011 medical interrogatory (R. 14-15). The ALJ afforded "little weight" to Dr. Pierre-Louis' November 2009 RFC questionnaire because he "had seen the claimant only one time in July 2009" (R. 16) (which the Commissioner concedes was incorrect; Dr. Pierre-Louis had seen Mr. Chavez three times prior to completing the November 2009 questionnaire). The ALJ afforded Dr. Freeman's opinion "substantial weight" because "unlike most of the claimant's other sources," Dr. Freeman reviewed the entire medical record and listened to Mr. Chavez testify (*Id.*).[6] The ALJ did not discuss the claimant's testimony other than simply stating that the "claimant's allegations regarding the limiting effects and the severity of the symptoms of his impairments [were] only partially credible" (*Id.*).

---

[6] We note that statement, too, is incorrect. Dr. Freeman did not review the August 2009 EEG. And, there is no evidence in the record, including the hearing transcript, that Dr. Freeman attended the hearing or heard Mr. Chavez testify.

13

At Step 4, the ALJ determined that the claimant was capable of performing his past relevant work as an automobile self-service station attendant (R. 16). The ALJ made an alternative Step 5 finding, and concluded that based on Mr. Chavez's RFC, jobs exist in significant numbers in the national economy that he could also perform, such as sales attendant, day worker (housecleaner), and recreation aide (R. 17).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Mr. Chavez contends that the ALJ erred by: (1) not properly considering the entire record because he improperly discounted the treating physician's opinion, improperly rejected Mr. Chavez's abnormal EEG and did not properly consider Mr. Chavez's statements; and (2) not properly considering the vocational expert's testimony (doc. # 17). For the reasons that follow, we find that the ALJ erred in his weighing of the medical testimony and failed to offer a sufficient basis for discounting Mr. Chavez's credibility. We therefore grant Mr. Chavez's motion for remand on those bases.

14

## A.

Mr. Chavez argues that the ALJ erroneously gave more weight to the opinion of the state agency physician, Dr. Freeman, than to that of claimant's treating physician, Dr. Pierre-Louis. We agree that the ALJ did not provide sufficient reasoning for disregarding Dr. Pierre-Louis' conclusions or for crediting those of Dr. Freeman. This failure was based on a number of factual and procedural missteps that undermine the ALJ's attempt to create a logical bridge between the medical evidence and his conclusion.

"The opinion of a treating doctor generally is entitled to controlling weight if it is consistent with the record, and in any event cannot be rejected without a 'sound explanation.'" *Sambrooks v. Colvin*, No. 13 C 2529, -- Fed.Appx. --, 2014 WL 2700119, at *4 (7th Cir. June 16, 2014), (quoting *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)). Further, when comparing doctors' opinions, agency regulations require that more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, and (5) offered opinions that are consistent with objective medical evidence and the record as a whole. 20 C.F.R. § 404.1527(c)(2)(i), (ii), *cited in Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

In this case, the ALJ's sole stated reason for giving Dr. Pierre-Louis's opinion little weight is that he only saw the claimant one time before completing the RFC questionnaire. This is patent error: Mr. Chavez saw Dr. Pierre-Louis, a neurologist, three times before he filled out the questionnaire. Further, during one of those appointments Mr. Chavez underwent an EEG which Dr. Pierre-Louis judged abnormal. Although the ALJ eventually saw the EEG, the ALJ's

15

opinion does not disclose whether he considered Dr. Pierre-Louis' review of it or even if he knew that Dr. Pierre-Louis was the doctor to both order the test and interpret the results.[7]

By contrast, the ALJ gave substantial weight to the opinion of medical expert Dr. Freeman, an internist who (unlike Dr. Pierre-Louis), had never seen Mr. Chavez and did not specialize in neurology. The ALJ supported his decision to accord substantial weight to Dr. Freeman's opinion by stating that Dr. Freeman had the opportunity to review the entire record and to hear the claimant testify (R. 16). This statement by the ALJ was simply wrong. There is no evidence that Dr. Freeman heard Mr. Chavez testify. And, Dr. Freeman did not, in fact, review the entire record. He never received a copy of the EEG that Mr. Chavez underwent in August 2009, and thus there is no medical evidence contradicting Dr. Pierre-Louis' finding that the EEG showed abnormal slowing of brain activity and sharp transients in the right frontal area (R. 379).

The ALJ surely was aware that Dr. Freeman had not reviewed the EEG when Dr. Freeman reached his conclusions. At the end of the July 20, 2011 supplemental hearing, the ALJ noted that the EEG was referenced but not contained in the file (R. 49). The EEG was supplied to the ALJ on August 10, 2011 (R. 378). Mr. Chavez's counsel requested that the ALJ provide Dr. Freeman with the EEG on August 16, 2011 (R. 285); the ALJ issued his opinion the very next day, without providing the report to Dr. Freeman.

---

[7] The Commissioner argues that Dr. Pierre-Louis should not be considered a treating physician because he only saw Mr. Chavez three times before completing the RFC. We do not need to reach the merits of this argument because it is undisputed that the ALJ based his decision on the erroneous belief that Mr. Chavez had only seen Dr. Pierre-Louis one time. In any event, neither case law nor the regulations sets forth a hard and fast rule for determining how many times a physician must see a patient before he or she can be considered a "treating" doctor. While one time may not be enough, *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005), we cannot conclude that three appointments in a 3 ½ month span are insufficient to qualify a doctor as a treater, particularly when (as here) one of those appointments included an objective medical test which formed part of the basis for the doctor's opinion. *Compare White*, 415 F.3d at 659 (upholding ALJ's decision to discount treating doctor's RFC because it was based solely on claimant's subjective complaints of pain and inconsistent with other medical evidence).

The ALJ explained that the EEG did not change his opinion because Mr. Chavez was not taking medication at the time of the test (R. 13). However, that explanation is problematic because "an ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The only medical evidence regarding the EEG in the record is from Dr. Pierre-Louis, who interpreted it as abnormal without reference to Mr. Chavez's treatment compliance. Absent any support to the contrary, the ALJ erred in opining that the EEG should be discounted.

Indeed, Dr. Freeman agreed that Mr. Chavez had a "seizure disorder, active" (R. 371), and that his seizures were "at high frequency" (R. 376). He also agreed that "even with full treatment compliance," Mr. Chavez would not be able to engage in tasks that required constant attention (R. 377). Dr. Freeman also specifically noted that he could not consider whether Mr. Chavez's impairment met one of the listed impairments because there was "no EEG" (*Id.*). Dr. Freeman's own report thus underscores why it was important for him to review the EEG if the ALJ was inclined to accord Dr. Freeman's opinions greater weight than the opinions of Dr. Pierre-Louis, who did review the EEG.

At bottom, the ALJ failed to build a logical bridge between the evidence and his decisions (1) to disregard an EEG that, according to the only medical expert to review it, found Mr. Chavez to have abnormal brain activity, (2) to give substantial weight to an agency examiner who is not a specialist in seizures, and who never saw the EEG or Mr. Chavez, and (3) to justify that decision by saying that Dr. Freeman had access to the entire record and heard Mr. Chavez testify when that was in fact not so. As a result, we must remand the case.

## B.

While the treatment of the opinion evidence of Drs. Pierre-Louis and Freeman alone requires a remand, we conclude another error by the ALJ warrants brief discussion so that it is not repeated on remand: the ALJ's credibility determination. While we review an ALJ's credibility determination deferentially and uphold it unless it is "patently wrong," *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), the ALJ still must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)(internal citations omitted). The regulations emphasize how important it is for the ALJ to explain the reasons for his credibility finding. *Reid v. Astrue*, No. 09 C 6906, 2011 WL 1485276 at *10 (N.D. Ill. April 19, 2011).

In *Reid*, the claimant argued that the ALJ's credibility determination was improper because he did not provide specific reasons for his decision but instead used boilerplate language that was insufficient to support his findings without further explanation. *Reid*, 2011 WL 1485276 at *10. Instead of specifying which parts of the claimant's testimony he did not believe or credit, the ALJ paraphrased the claimant's testimony and concluded -- without explanation -- that it was not plausible *Id.*; *see also* SSR 96-7p ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight"). The court in *Reid* was unable to ascertain *why* the ALJ found the claimant to lack credibility and agreed with the claimant that the credibility determination was insufficiently explained. *Reid*, 2011 WL 1485276 at *10.

In the instant case, the ALJ's reasons for finding Mr. Chavez's testimony to be only partially credible are not just scarce, but nonexistent. The ALJ here does not even paraphrase Mr. Chavez's testimony or discuss his symptoms, complaints of pain, or anything else he described about his medical or work history. He also completely fails to discuss Mr. Chavez's sister's testimony. Instead, his opinion simply states that he finds "the claimant's allegations regarding the limiting effects and the severity of the symptoms of his impairments. . . only partially credible," with no other explanation (R. 16). This flaw in his credibility assessment warrants remand.

Because we remand on the reasons stated above, we need not reach Mr. Chavez's remaining arguments concerning the VE. However, on remand, the ALJ should reconsider the VE's testimony with respect to Mr. Chavez's limitations after affording proper weight to Dr. Pierre-Louis' opinions and the Plaintiff's own testimony.

## CONCLUSION

For the reasons set forth above, we grant Mr. Chavez's request for remand (doc. # 17), and deny the Commissioner's request for affirmance (doc. # 26). This case is remanded for further proceedings consistent with this ruling.[8]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: July 8, 2014

---

[8] We reject Mr. Chavez's alternative request for a reversal and an award of benefits; we are not prepared to say that Mr. Chavez must inevitably be found disabled. We leave that determination in the first instance to the ALJ on remand.